**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert WARE, Jr., Defendant–Appellant.**

**No. 97–5771.**

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 22, 1998.

Decided Dec. 3, 1998.

David L. Cooper (argued and briefed), Cannon, Cannon & Cooper, Goodlettsville, Tennessee, for Defendant–Appellant.

Michael L. Roden (argued and briefed), Office of U.S. Attorney, Nashville, Tennessee, for Plaintiff–Appellee.

Before: WELLFORD, NORRIS, and BATCHELDER, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court, in which ALAN E. NORRIS and WELLFORD, JJ., joined, with WELLFORD, J. (pp. 425–427), also delivering a separate concurring opinion.

## OPINION

BATCHELDER, Circuit Judge.

Defendant Robert Ware, Jr. appeals his conviction for conspiracy to distribute and possession with intent to distribute cocaine and conspiracy to distribute and possession with intent to distribute cocaine base in violation of 21 U.S.C. § 846, and unlawful distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). For the following reasons, we AFFIRM Ware's conviction.

### I. Background

In April 1994, officers of the Nashville Metro Police Department followed up an anonymous complaint that cocaine was being sold from a house at 211 Treutland Street in Nashville. The house, which was surrounded by a chain link fence, had barred windows and metal security doors, and was guarded by a rottweiler and a pit bull as well as lookouts who patrolled the front and back of the house. A confidential informant for the Metro Police Department made a series of controlled purchases through the back metal security door of the house; although the informant never entered the house, he was able to see inside, and, on various occasions, observed a firearm on the kitchen table, a large amount of a substance appearing to be cocaine, and five to ten people inside the house. Police surveillance identified one of the people inside the house as Robert Ware, the defendant in this case.

After field testing indicated that the informant's purchases were cocaine, the officers obtained a search warrant, which they executed on April 15, 1994. The officers seized

crack cocaine, various drug paraphernalia, numerous guns, ammunition, a silencer and a bullet proof vest. Robert Ware was among the individuals found on the premises and arrested. Although state charges were filed against him and the other occupants of the house, Ware was not detained.

On July 14, 1994, a special agent with the United States Drug Enforcement Agency, assisted by a Nashville Metro Police task force officer, arrested Shaketa Phillips and Ruchelle Curry at the Nashville International Airport, having received information that two individuals matching Phillips's and Curry's descriptions would be arriving at the airport with a quantity of cocaine. Phillips and Curry consented to a search, and inside a bag carried by Phillips, the officers found four packages of white powder, later determined to be approximately four kilograms of cocaine. From the DEA's airport office, Phillips called a phone number which police found was listed to the defendant's girlfriend at 214 Treutland Street. Following their arrest, Phillips and Curry began cooperating with the government and identified Ware as the ringleader of a cocaine importation and distribution operation working first out of the fortress at 211 Treutland and then, after the April 1994 raid, out of 214 Treutland.

Through further investigation, including an undercover operation targeting a woman named Jacqueline Woods, the officers were able to corroborate Phillips's and Curry's information about Robert Ware's involvement in the cocaine operation. The officers discovered, for example, that Ware had sent various individuals to California on numerous separate occasions to purchase cocaine for him from an individual named Michael Sims. Woods, en route to Los Angeles to purchase drugs for Ware with $54,000 and a man named Norman Pinkston, was apprehended at the Atlanta airport on July 6, 1994. She was arrested for giving a false name, whereupon she called Ware in Nashville, and Ware, Shaketa Phillips and a lawyer named Dennis Hughes traveled to Atlanta to post her bail. Michael Perry, another courier, was arrested at the Nashville airport in August 1994 carrying $47,000 that was to be used to purchase cocaine for Ware.

On January 17, 1996, a federal grand jury returned a seven count indictment against Robert Ware, Jr., Michael Sims, Norman Pinkston, and Michael Perry charging them with conspiracy to distribute cocaine and cocaine base. The federal grand jury returned a superseding indictment which added Jacqueline Woods as a defendant to four of the seven counts.

The district court conducted an evidentiary hearing on March 3, 1997 on Ware's motion to suppress evidence seized on April 15, 1994, from 211 Treutland Street. The court denied the motion and the case proceeded to a jury trial. At trial, both Shaketa Phillips and Ruchelle Curry testified. Each acknowledged that she had been indicted by a federal grand jury following her arrest in July 1994 and had entered into a plea agreement with the government; each acknowledged that under her plea agreement one of the two counts of the indictment was dismissed and she received leniency in sentencing in return for her pleading guilty to the remaining count of the indictment and testifying at Ware's trial. Phillips testified that Ware was known by the street name "Low," that while living at 211 Treutland Street, she had witnessed the selling of cocaine from that address, and that Low was in charge of the transactions from 211 Treutland. She further admitted to selling cocaine and to traveling to California at Ware's direction six times between March 1994 and July 1994 to purchase cocaine. She was accompanied on those trips—which she recorded in her date book—by numerous individuals, including Ware in April, Jacqueline Woods, and Ruchelle Curry. Phillips recalled purchasing approximately one kilogram on her first trip, "two or three" kilograms on each of the next trips, about three kilograms on the fourth trip, and "two or three kilograms" on the fifth. On each trip, Ms. Phillips met with Michael Sims, known as Money, who took the money packed in Phillips's bag by Ware, and provided the cocaine which Phillips transported to Nashville, either taped on her body or concealed in carry-on luggage where she delivered it to Ware, who sold it, both as crack and in powder form, from 211 Treutland.

Hotel and phone records corroborated information supplied by Phillips about the California trips. Phillips further testified that Sims was arrested in Rutherford County, Tennessee, when visiting Nashville to meet with Ware, and that Phillips posted bond for him with Ware's money. Finally, Phillips testified about the trip to Atlanta with Ware and Dennis Hughes (then Ware's attorney) to post bond for Jacqueline Woods, including a discussion that took place en route between Hughes and Phillips, in which Hughes suggested a white family should be used to import the cocaine from California.

Jacqueline Woods and Norman Pinkston pled guilty to fewer than all of the counts against them, and at trial, testified that they had entered into plea agreements contingent upon their testimony against Ware. Woods testified that she had lived at 211 Treutland Street and had observed cocaine being sold from the house. She also described three trips to California to purchase cocaine for Ware from Sims and a trip with Ware to Arkansas to buy cocaine. Curry and Pinkston also testified to their roles as Ware's drug couriers and stated that Ware was known as Low.

During the course of the trial, the court dismissed one of the indictment's seven counts against Ware. The jury found Ware guilty on three of the remaining counts, and acquitted him on three counts. The district court sentenced the defendant to 30 years incarceration, five years of supervised release, and a special assessment. Defendant filed a timely notice of appeal from the judgment.

## II.  Discussion

### A.

Defendant initially claimed on appeal that the district court erred in admitting into evidence, without a Rule 404(b) limiting instruction or jury charge, drugs, guns, money and paraphernalia recovered pursuant to a state search warrant; in allowing the introduction of crack cocaine seized in the search of 211 Treutland, when the officer who recovered the cocaine did not testify at trial; in admitting as a co-conspirator statement the

hearsay testimony of Dennis Hughes; and in calculating the amount of cocaine, for purposes of the sentencing guidelines, based upon the testimony of Shaketa Phillips and Jacqueline Woods. Ware further claimed that the nighttime search of 211 Treutland Street executed by state police officers violated the Fourth Amendment to the United States Constitution and that the government failed to prove beyond a reasonable doubt the identity of the defendant.

Though the claims raised by the defendant were numerous, none was meritorious. For instance, Defendant filed a motion to suppress the evidence seized on April 15, 1994, from 211 Treutland Street, asserting that it should be excluded pursuant to Rule 404(b) of the Federal Rules of Evidence which provides

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .

FED. R. EVID. 404(b). According to the defendant, "the evidence from Treutland Street was uncharged criminal conduct which bears on the Defendant's character, which is what Rule 404(b) is designed to protect against." As the government correctly noted, however, the first two counts of the indictment charged the defendant with conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base from December 1993 through May 1995. The evidence defendant sought to exclude was seized on April 15, 1994 at defendant's residence. In response to defendant's argument that because the superceding indictment contained no gun counts, the admission of the guns into evidence created undue prejudice, the district court did characterize the guns as "part of all surrounding circumstances of his intent and [ ] admissible under 404(b)." The evidence seized, however, including the array of firearms, directly supports the charges against Ware. As the district court rightly noted, "Guns are a necessary adjunct to the crack trade . . . [and] the confidential infor-

mant had seen the weapon on the table when he made one of the purchases." *See Jennings v. Rees,* 800 F.2d 72, 75 (6th Cir.1986) (noting a "loaded handgun may fairly be viewed as a tool of the drug trafficker's trade"). The evidence seized pursuant to the search warrant was not evidence of other crimes or wrongs, but of involvement in the cocaine conspiracy at issue. Therefore, Rule 404(b) was simply not applicable. The remaining initial claims are similarly defective and do not merit further discussion.

In a supplemental brief, defendant argued that the government violated the provisions of 18 U.S.C. § 201(c)(2) when it made promises of leniency to co-defendants and cooperating witnesses in exchange for their testimony against the defendant, and that the failure of appellant's trial counsel to raise the issue constituted ineffective assistance of counsel that this Court may now consider on appeal. The defendant relies upon the rationale of *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). As the *Singleton* decision has generated significant fallout, we turn now to this claim.

### B.

■ On July 1, 1998, a panel of the 10th Circuit held that it was a violation of § 201(c)(2) for a federal prosecutor to enter into an agreement with an accomplice to the defendant on trial whereby the accomplice agreed to testify truthfully in return for leniency, including a possible § 5K1.1 motion from the government for downward departure. *United States v. Singleton,* 144 F.3d at 1347. The court excluded the testimony of the accomplice and reversed the conviction. The decision was vacated on July 10, 1998, by the 10th Circuit and set for en banc hearing in November 1998.

A number of district courts have addressed this issue in the wake of *Singleton* and rejected the rationale of the *Singleton* decision. *See, e.g., United States v. Szur,* 1998 WL 661484 (S.D.N.Y. Sept. 24, 1998); *United States v. Mejia,* 1998 WL 598098 (S.D.N.Y. Sept. 8, 1998); *United States v. Barbaro,* 1998 WL 556152 (S.D.N.Y. Sept. 1, 1998) (rejecting *Singleton*'s reasoning because of the historical acceptance of leniency condi-

tioned upon testimony agreements); *United States v. Juncal,* 1998 WL 525800 (S.D.N.Y. Aug. 20, 1998) (relying upon the historical acceptance and the canon requiring that the government be included in the text for the statute to encompass the government); *United States v. Gabourel,* 9 F.Supp.2d 1246 (D.Col.1998) (looking not only to the statute but the statutory context); *United States v. Guillaume,* 13 F.Supp.2d 1331 (S.D.Fla. 1998); *United States v. Eisenhardt,* 10 F.Supp.2d 521 (D.Md.1998) (soundly criticizing the reasoning of *Singleton,* particularly the application of the exclusionary rule); *United States v. Reid,* 1998 WL 481459 (E.D.Va. July 28, 1998); *United States v. Arana,* 1998 WL 420673 (E.D.Mich. July 24, 1998). *But see United States v. Fraguela,* 1998 WL 560352 (E.D.La. Aug. 27, 1998) (adopting *Lowery* ); *United States v. Lowery,* 15 F.Supp.2d 1348 (S.D.Fla.1998) (agreeing with *Singleton* that the plain meaning of § 201(c)(2)'s language encompasses the government).

### The language of 18 U.S.C. § 201(c)(2)

Section 201(c)(2) of Title 18 of the United States Code provides

> (c) Whoever—
>
> . . . .
>
> (2) directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;
>
> . . .
>
> shall be fined under this title or imprisoned for not more than two years, or both.

The *Singleton* court broadly interpreted the term "whoever" to include the United States government. We disagree. During the more than three decades that this provision has been around, no court until the *Singleton* panel has read this section to apply to the government. We think there are a

variety of valid reasons for that, as we shall explain.

■ To begin with, we conclude that the reach of § 201(c)(2) is limited by the canon of statutory interpretation that says that the general words of a statute do not include the government or affect its rights unless the text of the statute expressly includes the government. *Nardone v. United States,* 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937).[1] The *Nardone* Court made the cursory statement that "the cases in which [the canon] has been applied fall into two classes." *Id.* The first is where application of the statute to the government "would deprive the sovereign of a recognized or established prerogative title or interest". *Id.* The second is where application of a statute to public officers would create an obvious absurdity. *Id.* at 384, 58 S.Ct. 275. This case fits into both of those classes.

The prosecutorial prerogative to recommend leniency in exchange for testimony dates back to the common law in England and has been recognized and approved by Congress, the courts, and the Sentencing Commission of the United States. In *the Whiskey Cases,* 99 U.S. (9 Otto) 594, 25 L.Ed. 399 (1878), the Supreme Court acknowledged:

> Prosecutors in such a case should explain to the accomplice that he is not obliged to criminate himself, and inform him just what he may reasonably expect in case he acts in good faith, and testifies fully and fairly as to his own acts in the case, and those of his associates. When he fulfills those conditions he is equitably entitled to a pardon, and the prosecutor, and the court if need be, when fully informed of the facts, will join in such a recommendation.

*Id.* at 604.

The Supreme Court has repeatedly upheld the plea bargaining practices historically utilized in the United States's criminal justice system. In *Brady v. United States,* 397 U.S. 742, 751–3, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), for example, the Court said,

> The issue we deal with [the validity of a guilty plea entered after the defendant learned that his co-defendant had pled guilty and was available to testify against him] is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law....

> ... [W]e cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the State....

> A contrary holding would require the States and Federal Government to forbid guilty pleas altogether....

*Brady,* 397 U.S. at 751–53, 90 S.Ct. 1463. The Court went on to quote the Fifth Circuit: "[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats ... or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes)." (quoting *Shelton v. United States,* 246 F.2d 571, 572 n. 2 (5th Cir.1957) (*rev'd* on other grounds, 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958))). The clear implication of that language is that promises of leniency or of dismissal or reduction of charges *are* the prosecutor's business.

---

1. Although the *Singleton* panel noted this rule, the court found that it only applied to two classes of cases and § 201(c)(2) did not give rise to either class. 144 F.3d at 1345. Arguably the *Singleton* panel read *Nardone* too narrowly. As one judge observed, the *Nardone* decision "does not 'limit' application of the canon to only the two classes of cases discussed. All that the Court in *Nardone* stated was that the canon 'has been applied' to cases which fall into two classes.

Nothing in that decision or any other Supreme Court decision 'limits' application of the canon to only the two classes of cases mentioned." *United States v. Arana,* 1998 WL 420673, at *3 (E.D.Mich. July 24, 1998).

Nonetheless, if *Nardone* is read to exclude the government from the scope of a statute only in those two specific classes of cases, this Court finds that either class encompasses this case.

**420**

■ In carrying out his legitimate business it has always been properly within the prosecutor's prerogatives to offer these kinds of promises in return for a benefit to the government, often in the form of the defendant's cooperation. Plea agreements which make the government's promise to the defendant contingent upon the defendant's testifying in the trials of other offenders are certainly contemplated by the Federal Rules of Criminal Procedure. Rule 11(e), which sets out the procedure governing plea agreements, does not detail the kinds of commitments that the government may require of a criminal defendant in exchange for the government's promise to dismiss certain charges, or to permit a guilty plea to a lesser offense or to seek or recommend leniency in the sentence to be imposed; nonetheless, it is clear from the context of the rule and the Committee Notes detailing its history, not to mention decades of case law, that more may be required of the defendant than his simply giving up his right to trial. For example, the Advisory Committee notes to the 1974 amendments to Rule 11 note that "[f]inally, a plea agreement may also contribute to the successful prosecution of other more serious offenders. See D. Newman, Conviction: The Determination of Guilt or Innocence Without Trial, chs. 2 and 3 (1966); Note, Guilty Plea Bargaining: Compromises By Prosecutors To Secure Guilty Pleas, 112 U. Pa. L.Rev. 865, 881 (1964)." FED. R.CRIM. P. 11 advisory committee's notes. The notes to the 1975 amendments to Rule 11 are explicit:

> Proposed Rule 11(e) contemplates 4 different types of plea agreements.... [It is apparent, though not explicitly stated, that Rule 11(e) contemplates that the plea agreement may bind the defendant to do more than just plead guilty or nolo contendere. *For example, the plea agreement may bind the defendant to cooperate with the prosecution in a different investigation. The Committee intends by its approval of Rule 11(e) to permit the parties to agree on such terms in a plea agreement.*]

FED. R.CRIM. P. 11 advisory committee's notes (brackets in original)(emphasis added).

In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), an assistant United States Attorney neglected to disclose the government's promise to a government witness that he would not be prosecuted if he cooperated. The Supreme Court held that the failure to disclose the promise to the defense effectively resulted in a due process violation, and, accordingly, the government must disclose a promise of leniency to a witness provided in exchange for testimony by that witness. Similarly, the Supreme Court held in *Delaware v. Van Arsdall,* 475 U.S. 673, 679–80, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), that the fact that a witness had had a pending charge against him dismissed was evidence "that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony;" calling it a "prototypical form of bias on the part of the witness," the Court held that a refusal to permit a defendant to question the witness about the dismissal of the charge was a violation of the Sixth Amendment right to confrontation. Although the Supreme Court did not squarely address the legitimacy of such promises in these cases, the Court's holdings implicitly sanction promises of leniency.

In *Roberts v. United States,* 445 U.S. 552, 558, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), the Supreme Court affirmed a district court's prerogative to base a sentence, at least in part, on the defendant's refusal to cooperate with the authorities. The Court noted that the defendant had been offered a "favorable disposition of his case" in exchange for his revealing other heroin dealers in the community, and observed that his refusal to cooperate had the effect not only of protecting his former accomplices, but of ensuring his ability to resume his criminal activity upon expiration of his sentence. The Court expressly cast the obligation of the defendant to cooperate as a "deeply rooted social obligation [that] is not diminished when the witness to crime is involved in illicit activities himself." We view that opinion as an explicit approval of the use of testimony obtained through the use of a plea agreement. Interestingly, although Justice Marshall dissented in that case, his dissenting opinion expressly sanctioned the use of the plea bargaining process

to obtain testimony. "A second method available to the prosecutor for obtaining a defendant's testimony against others is the plea-bargaining process. The Court has upheld that process on the theory that the relative equality of bargaining power between the prosecutor and the defendant prevents the process from being fundamentally unfair." *Id.* at 568, 100 S.Ct. 1358.

Circuit courts have followed suit, recognizing plea agreements conditioned upon testimony by co-defendants or co-conspirators. As stated by the Fifth Circuit, "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). *See also United States v. Dailey,* 759 F.2d 192, 196 (1st Cir.1985)(holding that plea agreements with testifying accomplices did not create such a risk of perjury that the defendant's due process rights were violated by the admission of the accomplices' testimony at trial and noting "[l]ong ago the courts rejected the notion that the testimony of co-defendants and other interested witnesses was so likely to be unreliable that it should be excluded."); *United States v. Barrett,* 505 F.2d 1091, 1102 (7th Cir.1974)(holding that the government may grant civil immunity in exchange for testimony and stating that "[i]f the government can excuse criminal *or* civil liability in settling a criminal case, surely it can use that power of compromise to obtain guilty pleas or to procure testimony in other proceedings. Both are legitimate objectives of plea bargaining."); *United States v. Gomez,* 810 F.2d 947, 956 (10th Cir.1987); *United States v. Kimble,* 719 F.2d 1253 (5th Cir. 1983); *United States v. McCallie,* 554 F.2d 770, 772 (6th Cir.1977).

If 18 U.S.C. § 201(c)(2), which nowhere mentions the government, is nonetheless read to include the government, then a federal prosecutor's use of testimony obtained by means of plea agreements—one of the principal benefits to the government from plea agreements—is a criminal act. We think it is obvious that such a reading of the statute would deprive the sovereign of an established and recognized prerogative. Before we leave this first class of cases to which the *Nardone* canon applies, however, we note that the caveat attached to it, namely that "the rule of exclusion of the sovereign is less stringently applied where the operation of the law is upon the agents or servants of the sovereign, rather than on the sovereign itself," does not alter either our analysis or our conclusion. When an assistant United States Attorney (AUSA) enters into a plea agreement with a defendant, that plea agreement is between the United States government and the defendant. When an AUSA uses at trial testimony obtained through a plea agreement or an agreement not to prosecute, he does so as the government. An AUSA who, pursuant to the provisions of the United States Sentencing Guidelines, moves for a downward departure under § 5K1.1, does so as the government. "Upon motion of *the government* stating that the defendant has provided substantial assistance in the investigation or prosecution of another person ... the court may depart from the guidelines." USSG § 5K1.1 (emphasis added).

Even if we were to consider the AUSA as simply an agent or servant of the government, however, we conclude that this case falls within the second class of cases mentioned in *Nardone.* Those are the cases where the application of the statute to public officers would work an obvious absurdity. *Nardone,* 302 U.S. at 384, 58 S.Ct. 275.

The most obvious absurdity such a reading works is that AUSAs who entered into any plea agreements pursuant to Rule 11(e) would be subject to fines and imprisonment. This result cannot be avoided by attempting to argue that the language of the statute forbids only the use of the testimony from a witness who has entered into the plea agreement, not the plea agreement itself. Because a defendant who enters into a plea agreement pursuant to Rule 11 must appear before the court and enter his plea, the defendant's entry of that plea is testimony. "Central to the plea and the foundation for

entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself." *Brady v. United States,* 397 U.S. at 748, 90 S.Ct. 1463. If § 201(c)(2) applies to AUSAs at all, it applies to those who obtain the guilty plea itself by bargaining.

To apply § 201(c)(2) to the government in the person of the AUSA works the further absurdity of making criminal that which is explicitly permitted pursuant to other sections of the United States Code as well as the Sentencing Guidelines. The Sentencing Reform Act, enacted by Congress in 1984, among other things, established the United States Sentencing Commission, charged with the duty of promulgating and distributing to the federal courts guidelines to be used in sentencing. *See* 28 U.S.C. § 994(a). The Act explicitly requires the Commission to

> assure that the guidelines reflect the general appropriateness of imposing a lower sentence than would otherwise be imposed, including a sentence that is lower than that established by statute as a minimum sentence, to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.

28 U.S.C. § 994(n). The Act further provides:

> Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense. Such sentence shall be imposed in accordance with the guidelines and policy statements issued by the Sentencing Commission pursuant to section 994 of title 28, United States Code.

18 U.S.C. § 3553(e). Finally, of course, the guidelines themselves contain the Commission's Policy Statement, as required by 28 U.S.C. § 994(n), governing downward departures for defendants who provide "substantial assistance in the investigation or prosecution of another person who has committed an offense." USSG § 5K1.1. Included in the factors that the court may consider in determining whether to grant the motion for downward departure—which may be made only by the government—is "the truthfulness, completeness, and reliability of any information *or testimony* provided by the defendant," USSG § 5K1.1(a)(2) (emphasis added). To apply the general language of 18 U.S.C. § 201(c)(2) to federal prosecutors in the face of the specific provisions of the Sentencing Reform Act and the Sentencing Guidelines is absurd.

Equally, although perhaps somewhat less obviously, absurd is the effect on the statutory scheme providing for immunity of witnesses that would result from applying § 201(c)(2) to public officers. Sections 6001 through 6005 of Title 18, enacted in 1970 as part of the Organized Crime Control Act, expressly provide that immunity from prosecution may be given to witnesses under certain conditions. Section 6003 specifically authorizes a United States Attorney, with the approval of the Attorney General or various underlings of that office, to request from a United States district court an order granting immunity to a witness whose testimony the United States Attorney considers necessary in the public interest. Certainly there is no purpose for a grant of immunity to a witness except to obtain his testimony. And certainly immunity from prosecution is "[some]thing of value" given "for or because of the testimony under oath or affirmation." 18 U.S.C. § 201(C)(2). Do we then assume that the Congress enacted these immunity provisions with the intention that they be utilized by the United States Attorneys under pain of criminal sanction? [2]

---

**2.** We think the *Singleton* panel's attempt to dodge this obviously absurd result is a fine bit of sophistry. That panel said that "the government does not give immunity directly for the witness's testimony; the government may move the court to grant immunity." The immunity statute does not permit the court to grant immunity on its own motion; the United States Attorney must make that motion. Section 201(c)(2) prohibits the giving, offering or promising, either directly or indirectly, of anything of value in exchange for testimony. Unless the United States Attorney makes the request, there will be no immunity granted. At the very least, that is an indirect

■ There is an additional canon of statutory construction which dictates that the specific statute controls over the more general provision. *See HCSC–Laundry v. United States*, 450 U.S. 1, 5, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981); *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). From the foregoing discussion, it is apparent that the more recently enacted statutes and Sentencing Guidelines specifically allow what a broad interpretation of the more generally applicable § 201(c)(2) would prohibit. Applying this basic ·principal of statutory construction, the specifically applicable statutes control to validate plea agreements conditioned upon testimony despite § 201(c)(2).

**Legislative History**

If despite the above discussion one were to interpret an ambiguity from the language of the statute, an examination of the legislative history would be in order. Although we discern no such ambiguity, we further note that nothing in the legislative history indicates it applies to prosecutors.[3] Though S.R. Rep. 87–2213, which mirrors the language of H.R.Rep. No. 87–748, notes in the section-by-section analysis that subsection (h) of § 201 (the predecessor of (c)(2)) "forbids offers of payments to a witness of anything of value 'for or because of' testimony given or to be given," that is the extent of the analysis. The legislative history is void of any declaration that Pub.L. No. 87–849 was intended to thwart the long-sanctioned prosecutorial prerogative challenged by Defendant Ware in this case.

Section 201 enacted in 1962 by Pub.L. No. 87–849 underwent alteration through amendments in 1970, 1986, and 1994. The latter two technical amendments were subsequent to 18 U.S.C. § 3553, 28 U.S.C. § 994, and 18 U.S.C. §§ 6001–6005, yet a conflict between the statutes was never addressed. In particular, subsection (e) was added to 18 U.S.C. § 3553 and became law two weeks prior to amendments to § 201 that reworded § 201(c)(2),[4] without one word of explanation reconciling the contradiction that would exist in the terms of these provisions if § 201(c)(2) includes the government. Clearly the explanation is that no such conflict exists as § 201(c)(2) was never intended to apply to the government. *See*, Pub.L. No. 99–570 § 1007, 1986 U.S.C.C.A.N. (100 Stat. 32707) 5393; Pub.L. No. 99–646 § 48, 1986 U.S.C.C.A.N (100 Stat. 3592) 6139.

Further, while it is not our function to involve the court in policy-making, to the extent that the statute is silent and the legislative history contains no indication otherwise, and faced with the longstanding prosecutorial discretion, inclusion of the government within the reach of § 201(c)(2) would clearly be bad policy. It is an occupational hazard of prosecutors that to prove the guilt of a criminal defendant beyond a reasonable doubt, they often must rely on the testimony of other criminal defendants, many of whom are less than enthusiastic about assisting the prosecution. To now deprive prosecutors of all accomplice or co-defendant testimony except that which is voluntarily provided without hope of benefit to the volunteer, would be to seriously undermine the ability of prosecutors to prosecute.

offer, promise or gift. We wonder as well, in passing, whether the court that actually grants the immunity is not a "Whoever—" for purposes of § 201(c)(2).

Further, to the extent that the *Singleton* panel rested its argument on the view that the grant of immunity simply "removes the witness's testimonial privilege so the ordinary compulsion may be brought to bear to require the witness to testify," we would observe that the grant of immunity in fact immunizes the witness from having that testimony, or evidence derivatively obtained from it, used against him. *See* 18 U.S.C. § 6002. Beyond cavil, that is something of value provided in exchange for the testimony.

**3.** The *Singleton* court remarkably asserted that "[t]he legislative history confirms Congress's purpose that giving or receiving anything of value by 'witnesses for or because of ... testimony should also be prohibited'" citing H.R.Rep. No. 87–748 at 16 (1961).

**4.** The 1986 amendments to 18 U.S.C. § 201 included certain delegates to Congress in the bribery prohibition and consolidated a number of subsections. Section 201(h) thus became 201(c)(2). The language was also modified to be gender neutral. Pub.L. No. 99–646, 100 Stat. 3592.

The *Singleton* court, and the district courts who have chosen to follow the rationale of *Singleton, United States v. Mays*, No. 97–CR–127 (E.D.Tenn. Sept. 18, 1998); *United States v. Fraguela*, 1998 WL 560352 (E.D.La. Aug. 27, 1998); *United States v. Lowery*, 15 F.Supp.2d 1348 (S.D.Fla.1998), focus on the unreliability of testimony induced by plea agreements and the tainting of the judicial process. The *Lowery* decision, adopted in its entirety by the courts in *Fraguela* and *Mays*, reasoned that including the government and plea agreements "within the reaches of Section 201(c)(2) ensures that the judicial process will remain untainted by the admission of purchased testimony." 15 F.Supp.2d at 1355. As one district court correctly pointed out however, "the disclosure of the plea agreements to defense before trial, cross-examination of cooperating witnesses, and jury instructions all provide opportunity to ferret out false testimony that an interested witness might give because of a government promise." *United States v. Reid*, 19 F.Supp.2d 534, 537 (E.D.Va.1998).

**Application of the Exclusionary Rule**

■ Finally, even assuming that federal prosecutors are encompassed by the statute, there is no basis for the application of the exclusionary rule here. A district court judge aptly characterized *Singleton*'s "creation ex nihilo of an exclusionary rule barring testimony from virtually every cooperating federal witness" as "amazingly unsound" and "nonsensical." *United States v. Eisenhardt*, 10 F.Supp.2d 521(D.Md.1998).[5]

■ The statute provides specifically for fines or incarceration for violations of § 201(c)(2). Generally, when Congress has designated a specific remedy for violation of one of its acts, courts should presume that Congress has engaged in the necessary balancing of interests to determine the appropriate penalty. *See United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir.1991); *see*

also *United States v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir.1986); *United States v. Kington*, 801 F.2d 733, 737 (5th Cir.1986). "Where Congress has both established a right and provided exclusive remedies for its violation, we would 'encroach upon the prerogatives' of Congress were we to authorize a remedy not provided for by statute." *United States v. Frazin*, 780 F.2d 1461, 1466 (9th Cir.1986). *See also United States v. Ani*, 138 F.3d 390, 392 (9th Cir.1998).

■ Statutory violations, absent any underlying constitutional violations or rights, are generally insufficient to justify imposition of the exclusionary rule. *United States v. Thompson*, 936 F.2d at 1251. "There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule." *United States v. Harrington*, 681 F.2d 612, 612 (9th Cir.1982). As explained by the Fifth Circuit, "[t]he exclusionary rule was not fashioned to vindicate a broad, general right to be free of agency action not 'authorized' by law, but rather to protect specific, constitutionally protected rights." *United States v. Hensel*, 699 F.2d 18, 29 (1st Cir.1982).

While the exclusionary rule has been applied to remedy statutory violations, these cases typically implicate underlying constitutional rights such as the right to be free from unreasonable search and seizure. *See Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958)(excluding money seized because federal officers violated 18 U.S.C. § 3109 by breaking through a door without indicating their authority and purpose to arrest); *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956); *United States v. Soto–Soto*, 598 F.2d 545 (9th Cir.1979)(suppressing evidence obtained by an illegal border search in violation of federal statutes); *United States v. Marts*, 986 F.2d 1216 (8th Cir.1993)(suppression due to 18 U.S.C. § 3109 knock and announce violation).

---

**5.** Actually Judge Smalkin of the district of Maryland characterized the entire *Singleton* opinion as unsound and nonsensical but viewed as especially so the application of the exclusionary rule. The judge also predicted, "the chances of either or both the Fourth Circuit and the Supreme Court reaching the same conclusion as the *Singleton* panel are, in this Court's judgment, about the same as discovering that the entire roster of the Baltimore Orioles consists of cleverly disguised leprechauns." 10 F.Supp.2d at 521–22.

The exclusionary "rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial." *United States v. Caceres,* 440 U.S. 741, 754, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). Though the Court in *Caceres* noted in a footnote that the challenged conduct did not violate any statute, and thus did not implicate *Miller v. United States,* we do not believe the Court intended to sanction the application of the exclusionary rule to mere statutory violations across the board.[6] To the contrary, the Court in *United States v. Payner,* stated that "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury. After all, it is the defendant, and not the constable, who stands trial. " 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (citations omitted)(concluding that the supervisory power does not authorize a federal court to suppress evidence on the ground that it was seized unlawfully from a third party not before the court).

Accordingly, even if we could make the great leap necessary to include prosecuting attorneys within the scope of § 201(c)(2), we would not apply the exclusionary rule to suppress the testimony of cooperating accomplices. Congress has provided the penalties for violations of this statute and extension of the exclusionary rule is not appropriate.

### III. Conclusion

For the foregoing reasons, the conviction of Robert Ware, Jr. is **AFFIRMED.**

WELLFORD, Circuit Judge, concurring.

I concur with the majority view that we should affirm the convictions of defendant Ware. My concurrence deals with the issue addressed in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), *vacated for en banc review.* The Tenth Circuit in *Singleton* interpreted 18 U.S.C. § 201(c)(2), for the first time, to make it a crime for a federal prosecutor to enter into a plea agreement wherein the government offers leniency to a witness in exchange for his or her testimony, even though the agreement provides that such testimony must be truthful under penalties of perjury. *Id.* at 1344. In addition, the court in *Singleton* determined that the remedy for this statutory violation was to hold that such testimony was inadmissible.

In reaching that conclusion, the court in *Singleton* attempted to distinguish three cases discussing some aspect of the issue, and it concluded that none were determinative. *See United States v. Isaacs,* 347 F.Supp. 763 (N.D.Ill.1972); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *United States v. Blanton,* 700 F.2d 298, 310–11 (6th Cir.), *reh'd in part,* 719 F.2d 815 (6th Cir.1983) (in order of discussion in *Singleton* ). In addition, the *Singleton* court rejected two other cases decided by the Eleventh Circuit which held that § 201(c) did not apply to the procurement of truthful testimony. *Golden Door Jewelry Creations v. Lloyd's Underwriters,* 117 F.3d 1328, 1335 n. 2 (11th Cir.1997) (citing *Moody* ); *United States v. Moody,* 977 F.2d 1420 (11th Cir. 1992). In my view, *Blanton,*[1] *Giglio, Moody,* and *Golden Door* are pertinent to the issue before us. *See United States v. Reid,* 19 F.Supp.2d 534 (E.D.Va.1998).

In *Blanton,* the defendant alleged that the government violated § 201(c) by giving a witness the assurance that his liquor license would not be revoked by the Alcoholic Beverage Commission ("ABC") in exchange for his testimony. The defendant argued that persuading the ABC not to revoke the witness'

---

**6.** In fact, the *Miller* Court was at pains to emphasize with regard to the statute at issue there that "Congress, codifying a tradition embedded in Anglo–American law, has declared in § 3109 the reverence of the law for the individual's right of privacy in his house." *Miller,* 357 U.S. at 313, 78 S.Ct. 1190. No such tradition exists with regard to 18 U.S.C. § 201(c)(2).

**1.** At least one authority cites *Blanton* in support of its decision to reject the *Singleton* § 201(c)(2) rationale, stating "the Government cannot be deemed to violate Section 201(c)(2) when it enters into a Rule 11 agreement based upon the defendant's cooperation because it does nothing more than request or recommend that the court take a certain action." *United States v. Arana,* 18 F.Supp.2d 715 (E.D.Mich.1998).

liquor license was "a thing of value" given by the government in violation of the statute. This court disagreed, finding that the ABC's decision not to revoke the witness' license was within its discretion and was merely a preservation of the status quo. Therefore, this conduct did not violate § 201(h), the precursor of § 201(c).

The Supreme Court *Giglio* held that "a promise of lenity made to a key witness in return for his testimony must be revealed to the defendant." *Giglio*, 405 U.S. at 153–54, 92 S.Ct. 763. The Court made no comment about the propriety of the government's promise of lenity. Thus, the court in *Singleton* determined that *Giglio* was not dispositive of the issue before it. *Singleton*, 144 F.3d at 1356.

The Eleventh Circuit in *Golden Door* interpreted its prior decision in *Moody* as explicitly standing for the proposition that § 201(c) applies only to false testimony. *Golden Door*, 117 F.3d at 1335 n. 2. Specifically, the court relied on the statement in *Moody* that "obviously [§ 201(c)] proscribes a bribe for false testimony; persons of ordinary intelligence would come to no other conclusion." *Moody*, 977 F.2d at 1424–25, *quoted in Singleton*, 144 F.3d at 1358. The *Singleton* court rejected the idea that *Moody* supported the holding in *Golden Door*, because the court in *Moody* had merely disposed of a vagueness/overbreadth challenge to the statute by concluding that it obviously applied to false testimony. What the court did not hold, according to *Singleton*, was that the statute would not apply in a case involving truthful testimony. *Singleton*, 144 F.3d at 1358. Thus, the Eleventh Circuit's position was not persuasive to the *Singleton* court under those circumstances.

All of those cases, save *Giglio*, dealt with the implication and meaning of 18 U.S.C. § 201(c)(2), but in a different fashion than did *Singleton*. I do not believe that statute is applicable to the government's conduct in this case because it was not akin to bribing or seeking corruptly to influence the witness nor intended to corrupt the trial process. The conduct was fully revealed to the adversary and the jury which was to weigh the credibility of the witness in light of any understanding with the government and the witness' promise to tell the truth.

Another case addressing the distinction between giving something of value for false testimony as opposed to truthful testimony is *United States v. Revis*, 22 F.Supp.2d 1242 (M.D.Pa.1998). The court in *Revis* considered the defendant's § 201(c)(2) argument and determined that "the promise to testify truthfully . . . was not consideration and was not given 'for' any promise by the United States Attorney." *Id.* at 1256. Rather, the court held, it was the witness' pre-existing duty to testify. I agree with this rationale. This is one basis for my disagreement with *Singleton*, that promising truthful testimony was not consideration for the contract since the witness committed to do only that which he would otherwise be called upon to do—to testify truthfully rather than falsely.

In addition, I disagree with the conclusion in *Singleton* that § 201(c)(2) "is to be broadly construed to further its legislative purpose of deterring corruption." *Id.* at 1345. *Singleton* cites in support of that principle only *United States v. Hernandez*, 731 F.2d 1147, 1149 (5th Cir.1984), and *United States v. Evans*, 572 F.2d 455, 480 (5th Cir.1978). *Hernandez*, in turn, cites only *Evans* as authority.[2] Those cases offer no persuasive reason to depart from the general rule that criminal statutes are to be construed narrowly, rather than broadly, in order to give the benefit of any ambiguity to the accused. *See United States v. Conners*, 606 F.2d 269, 272 (10th Cir.1979) (reasoning that "[c]riminal statutes must be strictly construed with ambiguities resolved in favor of the accused."). The Supreme Court has explained the reasoning behind this rule of construction:

> We have traditionally exercised restraint in assessing the reach of a federal criminal

**2.** *Evans* involved a different provision entirely of § 201 dealing with bribery of a government official to influence his actions. *Evans* made reference to a number of similar cases, some of which discussed the broad objectives of Congress and the broad scope of this statute designed to discourage this type of corruption. I believe the *Singleton* panel decision and *Hernandez* confused congressional intent to legislate broadly to cover bribery of government officials with the judicial interpretation to be given a criminal statute.

statute, both out of deference to the prerogatives of Congress, *Dowling v. United States,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985), and out of concern that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed," *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931).

*United States v. Aguilar,* 515 U.S. 593, 600, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995); *see United States v. Feroni,* 655 F.2d 707, 711 (6th Cir.1981) (holding that the principle of strict construction of criminal statutes compels a narrow construction of the criminal statute at issue).

Finally, it seems to me that the *Singleton* panel interpretation, if followed literally, would make the payment of costs, expenses, deposition fees, and any involvement given by any party to a witness, including the United States, "for or because of such testimony" illegal. Surely this was not the intent of the Congress. Such a result would constitute an absurdity, and I am in agreement with the majority opinion in affirming the jury verdict in this case.

Thus, I join in rejecting the *Singleton* panel decision for the additional reasons indicated.