[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Defendant-appellant Edward Taylor appeals from his conviction and sentence for Murder, following a jury verdict. Taylor contends that his conviction is against the manifest weight of the evidence and that the trial court erred by denying his request for a continuance of the trial date. Taylor also contends that his right to a fair trial was undermined by the trial court's failure to instruct the jury to view the testimony of a State's witness, who was granted immunity from prosecution, with more caution than usual. He further contends that by offering immunity to its witness, the State improperly "bought" testimony favorable to the prosecution.
We conclude that the record contains sufficient, credible evidence upon which a reasonable juror could rely in finding Taylor guilty beyond a reasonable doubt. We also find that the trial court did not abuse its discretion by denying Taylor's request for a continuance in light of the fact that he had previously been granted six other continuances. Also, we find that Taylor failed to request a jury instruction regarding the credibility of the State's witness, and that any error in failing to give the instruction does not rise to the level of plain error. Finally, we note that the practice of offering immunity in exchange for testimony is recognized both in State and federal criminal practice, and we conclude that there is no evidence to support a finding that the State improperly obtained the testimony of its witness.
Accordingly, the judgment of the trial court is Affirmed.
 I
On May 9, 1997, Paul Metz was shot and killed in the rear bedroom of his apartment. Earlier that day, Metz had asked an ex-neighbor, Tyaunna Landers, to find buyers for some marijuana he was receiving that day. Landers brought defendant-appellant Edward Taylor and an unidentified man, referred to only as "Joe," to Metz's apartment to purchase the marijuana. When the three first arrived at the apartment, only Paul and his girlfriend, Jody Brown were present. The five smoked some marijuana and discussed the price of the marijuana. After approximately thirty to forty-five minutes, Taylor, Joe and Landers left.
Later, Merle Lunsford arrived at the apartment. He brought six pounds of marijuana with him, as well as a .38 caliber Smith 
Wesson handgun, which he kept in his jacket pocket. Lunsford testified that he brought the gun with him upon Metz's request because Metz did not trust the buyers. Lunsford gave Metz five pounds of the marijuana, which Metz took into the back bedroom of the apartment; the other pound of marijuana was intended for another party. Shortly after Lunsford arrived, Landers, Taylor and Joe returned. Metz and Taylor went to a back bedroom, leaving Landers, Joe, Lunsford and Brown in the living room.
Brown and Landers testified that they heard a gunshot in the rear bedroom, and then Joe began shooting at Lunsford. Lunsford was not sure whether he heard the shots in the bedroom before Joe started shooting. Lunsford testified that Joe shot him in the forehead, causing him to fall back over the couch. He testified that Joe then shot him several times in the leg. According to Lunsford, he then pulled out his gun and returned fire at Joe, getting off two shots. He testified that Taylor came out of the bedroom with a gun and aimed at Lunsford. He testified that Taylor pulled the trigger, but the gun did not fire. Lunsford further testified that he fired approximately three times at Taylor, wounding him in the head. Taylor fled the apartment through the bedroom window.
At some point, Brown, Landers and Joe fled the apartment. Lunsford testified that before leaving the apartment he picked up Joe's .25 caliber silver automatic, and then left the apartment as well. He further testified that once outside the apartment, he saw Landers, Joe and Taylor getting into their car; at that point he attempted to shoot at them with Joe's gun, but the gun was empty. According to Lunsford, he then threw Joe's gun into a mud puddle, where it was later recovered. Lunsford then went to a fire department where he was treated and transported to a hospital. Lunsford testified that he disposed of his .38 caliber weapon and only turned it over to the authorities after he was assured of immunity for his testimony in the prosecution of Taylor.
Landers testified that after she fled the apartment, she helped Taylor into the Plymouth Breeze automobile they had arrived in. They drove away and picked up Joe somewhere on the street. Landers testified that they drove to Taylor's apartment where she and Taylor transferred into Taylor's car. Taylor and Landers then drove to Cincinnati so that Taylor could be treated at a hospital. Taylor and Landers told hospital staff and the Cincinnati Police that he had been shot when they stopped to ask for directions in Cincinnati. Taylor was subsequently arrested by the Dayton police.
Metz died as a result of four gunshot wounds. The coroner recovered only one bullet from his body; the bullet was from a .45 caliber weapon that was found in the bedroom with Metz. An atomic absorption test was performed on Metz's hands to test for gunpowder residue. Residue was found on his hands. An atomic absorption test performed on Lunsford's hands also indicated that he had gunpowder residue on his hands. No atomic absorption test was performed on Taylor's hands.
Taylor was indicted and charged with one count of Murder, with a firearm specification, on May 27, 1997. Trial was set for June 11, 1997. At Taylor's request, his trial date was reset on four separate occasions. On the morning of trial in October, 1997, Taylor fired his first attorney. Taylor's second attorney entered an appearance on November 3, 1997. A new trial date was set for January 29, 1998. A motion to continue that trial date was filed on December 11, 1997. The motion was granted and the trial was continued until February 9, 1998. Thereafter, on January 26, 1998, Taylor requested another continuance, seeking to have the trial date reset for March or April, 1998. The motion was denied after a hearing.
Trial by jury began on February 9, 1998. The jury found Taylor guilty as charged, a judgment of conviction was entered, and Taylor was sentenced accordingly. From his conviction and sentence, Taylor appeals.
 II
Taylor's First Assignment of Error states as follows:
 THE CONVICTION SHOULD BE REVERSED BECAUSE THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Taylor contends that his conviction must be reversed because it is not supported by the evidence. Specifically, Taylor argues that the conviction is against the manifest weight of the evidence because: (1) the State relied upon circumstantial evidence to prove that he shot Metz; (2) the physical evidence did not support the conviction; and (3) the testimony of one of the State's witnesses had "major credibility problems."
When reviewing a claim that a conviction is against the manifest weight of the evidence, this court has stated:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony.
 State v. Norton (Dec. 11, 1998), Greene App. No. 97 CA 112, unreported, citations omitted.
"While a court of appeals has the undoubted power and duty to determine whether a judgment is against the manifest weight of the evidence, it should reverse a conviction only under the most exceptional circumstances." State v. Bethley (May 8, 1998), Montgomery App. No. 16070, unreported, citing State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. "Because the factfinder, * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder who has seen and heard the witness." Id.
In seeking a reversal of his conviction, Taylor places emphasis upon the fact that the evidence presented by the State was largely circumstantial because no one actually observed him shoot Metz. In fact, at trial, defense counsel attempted to persuade the jury that Metz actually shot Taylor, and that someone else then shot Metz. A review of the transcript reveals that Jody Brown, Tyaunna Landers and Merle Lunsford testified that the first shot came from the back bedroom, and that Metz and Taylor were the only people in that room at that time. All three witnesses placed Taylor in the back bedroom with Metz when the shooting began. The witnesses also testified that Lunsford and Joe remained in the living room, where they proceeded to shoot at each other. Although Landers testified that Lunsford went back toward the bedroom, there was no evidence or testimony to indicate that he actually entered that room. Furthermore, Landers had previously made a statement to the police indicating that Lunsford had run out of the apartment right behind her.
Lunsford testified that he had a .38 caliber weapon, and that he shot Taylor in the head with it; he later turned the gun in to the police. When the shooting was over, Metz was found dead in the back bedroom with a .45 caliber semi-automatic pistol close to his body. The undisputed testimony indicated that Metz did not have a gun, and that no one saw him that day with a gun.
Taylor's hospital records indicate that he told medical personnel that he was shot by a .38 caliber weapon; a statement that belies his claim that he was shot by Metz with the .45 caliber weapon in the bedroom. We also note that there is no evidence in the record to support Taylor's claim that Metz shot him.
When the police searched the apartment, two bags of marijuana were found in the bedroom closet. Both bags had traces of blood on them consistent with Taylor's blood type. Three bags of marijuana were missing. Traces of marijuana were later found in the Plymouth Breeze. Also, a tooth was found on the bedroom floor; the testimony reveals that Taylor was missing a tooth after the shooting. A "Kangol" hat, identified as belonging to Taylor, was also found on the floor of the bedroom.
We have recognized that circumstantial evidence and direct evidence inherently possess the same probative value. State v.Redman (June 12, 1998), Clark App. No. 97 CA 81, unreported. "* * * [T]he validity of the verdict depends more upon the quality than the type of the evidence, and the overriding question in such cases is whether all of the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." Id.
Based upon the record In this case, we conclude that a jury could reasonably believe that Taylor, Joe and Landers went to Metz's apartment with the intent to steal Metz's marijuana. A jury could also believe that Metz was killed by Taylor, since they were the only two people in the bedroom when the shooting started. A jury could also believe that Taylor actually did steal a portion of the marijuana, since his blood was found on the two bags remaining in the closet, and traces of marijuana were later found in the getaway car.
We next turn to Taylor's challenge regarding the physical evidence. Specifically, as support for his claim that the conviction is not supported by the evidence, Taylor notes that no fingerprints were found on the murder weapon and that an atomic absorption test showed gunpowder residue on Metz's hands.
A fingerprint technician from the Miami Valley Regional Crime Lab testified that it is not unusual that fingerprints are not recovered from a firearm. In fact, the technician testified that only about one in seventy-five guns processed for fingerprints will yield usable prints. Also, another technician from the Crime Lab testified that the presence of residue on Metz's hands merely indicated that Metz was in close proximity to a gun when it was fired; it did not prove that he fired a gun. The technician also testified that in a majority of such cases, residue is found on the hands of the victim. We conclude that the physical evidence cited by Taylor does not cast doubt upon the correctness of the conviction.
Finally, we address Taylor's claim that Lunsford's testimony was riddled with credibility problems. He argues that Lunsford's testimony is "incredible" in at least two respects. First, he contends that Lunsford's testimony that he shot Taylor is not believable because "the bullet hole associated with that shot was only four feet above the floor, suspiciously low for a shot to the head." Second, he also contends that Lunsford's testimony that he brought his gun to the house upon Metz's request is inconsistent with the fact that Metz took Taylor back into the bedroom, away from Lunsford, to conduct the drug deal.
We find the argument in regard to the low height of the bullet hole without merit. The testimony was that Lunsford fell back onto the couch during the shooting, and was therefore in a seated or reclining position during the gunfire. Also, there is no evidence in the record to indicate what position Taylor was in when he was shot. A jury could reasonably infer that he was trying to make himself a small target, and was crouching when he was shot. Given the record before us, we cannot say that the height of the bullet hole makes Lunsford's testimony incredible.
We likewise find without merit the claim that Lunsford's testimony was not truthful simply because Metz took Taylor into the back bedroom to conduct the sale. Judging the credibility of witnesses is within the province of the jury. Counsel for Taylor did an effective job of cross-examining Lunsford and revealing his unsavory character. Counsel also showed the jury that Lunsford had not been cooperative with the authorities during the early part of the investigation. Therefore, given that the claimed inconsistency in the above-referenced testimony was brought to the jury's attention, we conclude that the jury was capable of determining Lunsford's credibility on that issue. Lunsford's presence in the apartment afforded some deterrence against any mischief on Taylor's part, directed at Metz, even though Lunsford was not in the bedroom where the transaction was evidently intended to occur. Indeed, as a result of Lunsford's presence, Taylor did not escape unscathed.
Our review of the record reveals that there is sufficient, credible evidence upon which a jury could rely in determining that Taylor was guilty of Murder beyond a reasonable doubt. Accordingly, the First Assignment of Error is overruled.
 III
In his Second Assignment of Error, Taylor argues as follows:
 THE TRIAL COURT COMMITTED PREJUDICIAL ERROR AND DENIED APPELLANT DUE PROCESS OF THE LAW WHEN IT FAILED TO GRANT DEFENSE COUNSEL A CONTINUANCE OF THE TRIAL DATE.
Taylor contends that the trial court abused its discretion when it denied his request for a continuance of the February 9, 1998 trial date. Taylor argues that by denying the continuance, the trial court interfered with his right to counsel of his choice. He also argues that counsel voiced legitimate reasons for the request; specifically his attorney requested the continuance because he had not yet seen the state's evidence, he did not have enough time to investigate, and he had just hired an expert investigator.
"The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge."State v. Mason (1998), 82 Ohio St.3d 144, 155, quoting State v.Unger (1981), 67 Ohio St.2d 65. In determining whether to grant a continuance, a trial court must weigh its "right to control its own docket and the public's interest in the prompt and efficient dispatch of justice" against "any potential prejudice to a defendant." State v. Unger (1981), 67 Ohio St.2d 65, 67. The factors to be considered by the trial court include:
 [T]he length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstances which gave rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.
 Id., at 67-68.
In reviewing the above-cited factors as they relate to this case, we find that Taylor's claim lacks merit. The length of the delay requested was relatively short, about one or two months. However, by the time of the request, Taylor had already been effectively granted six continuances of his scheduled trial date. Also, this case took ten days to try; therefore, finding a two-week block of time to which to reschedule this jury trial would not have been convenient for the trial court. Furthermore, since the case had already been continued six times, including on the day of trial, opposing counsel and the State's witnesses were obviously inconvenienced. Also, while counsel's expressed reasons for the delay were arguably legitimate, we note that he had been acting as defense counsel for three months at the time the matter was tried; an amount of time that is not unreasonably short to prepare for trial. We also find that Taylor did contribute to the reason for the delay by firing his first attorney at such a late date. Finally, we note that the record reveals that the family of the victim was opposed to any additional continuances. While this factor does not weigh as heavily in our opinion, we do find that it is a legitimate consideration for the trial court.
Taylor has failed to demonstrate that the trial court abused its discretion in denying the defense motion for a continuance. Furthermore, Taylor has not demonstrated that his counsel needed more time to effectively represent him. A review of the transcript reveals that counsel was well-versed in the evidence and was able to cross-examine the State's witnesses effectively. Furthermore, defense counsel was able to present the testimony of an expert supporting his theory of the case.
The Second Assignment of Error is overruled.
 IV
Taylor's Third Assignment of Error is as follows:
 THE TRIAL COURT COMMITTED PLAIN ERROR AND DENIED APPELLANT DUE PROCESS WHEN IT FAILED TO INSTRUCT THE JURY THAT IT SHOULD VIEW MERLE LUNSFORD'S TESTIMONY WITH GREATER CARE THAN UNUSUAL [SIC] BECAUSE OF LUNSFORD'S GRANT OF IMMUNITY FROM PROSECUTION.
Taylor contends that the trial court erred by failing to instruct the jury that Lunsford's testimony should have been viewed with greater caution than that of other witnesses because of the immunity he received from the State.
Taylor did not seek this instruction and did not object to the trial court's failure to give it. Therefore, he has waived all but plain error. To constitute plain error, Taylor must establish that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions.State v. Moreland (1990), 50 Ohio St.3d 58, 62.
Even were we to find that Taylor was entitled to the instruction, an issue we decline to address, that error does not rise to the level of plain error. A review of the record indicates that there was sufficient evidence upon which the jury could have convicted Taylor without the necessity of Lunsford's testimony. Lunsford's motive to obtain immunity was obvious. The jury was continuously reminded by defense counsel that Lunsford was not a reputable character. Defense counsel, both during Lunsford's cross-examination and closing argument, made certain that the jury was aware that Lunsford had been granted immunity and that he could have been charged with carrying a weapon under a disability and possession of six pounds of marijuana. The jury was also made aware of Lunsford's prior criminal history; he had a conviction in 1982 for Aggravated Robbery and a conviction in 1987 for Aggravated Drug Trafficking, Possessing a Weapon Under a Disability, and Receiving Stolen Property. Based upon the record, we find that the jury was apprised of Lunsford's past and any incentive or motives for testifying in this case. Therefore, we consider it unlikely that the outcome of the trial would have been different had a cautionary instruction been given.
Taylor's Third Assignment of Error is overruled.
 V
Taylor's Fourth Assignment of Error states:
 THE CONVICTION MUST BE REVERSED BECAUSE THE STATE GRANTED MERLE LUNSFORD IMMUNITY FROM PROSECUTION IN EXCHANGE FOR HIS TESTIMONY AGAINST APPELLANT, THUS APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WAS VIOLATED.
Taylor contends that the conviction must be reversed because the State granted immunity to Merle Lunsford in exchange for his testimony at trial. He argues that the practice of offering immunity to individuals in exchange for their assistance at trial constitutes "buying" that witness's cooperation. He urges this court to re-evaluate this practice on grounds that it is contrary to the Code of Professional Responsibility [specifically DR 9-102(A)(3), (4) and (5)], and violative of R.C. 2921.02(C) and a defendant's right to due process.
Taylor claims that DR 9-102(A)(3), (4) and (5) forbid a lawyer from engaging in illegal conduct involving moral turpitude, dishonesty, fraud, deceit, or misrepresentation, or conduct that is prejudicial to the administration of justice. However, DR 9-102(A) does not contain subsections (3), (4) or (5). Furthermore, the cited disciplinary rule relates to a lawyer's obligation to preserve the identity of a client's funds and property and is therefore irrelevant to the question before us.
Taylor also contends that the State's grant of immunity violates R.C. 2921.02(C), which states that "[n]o person with purpose to corrupt a witness or improperly to influence him with respect to his testimony in an official proceeding * * * shall promise, offer, or give him * * * any valuable thing or valuable benefit." In this case, there is no evidence that the offer of immunity was offered for other than Lunsford's truthful testimony at trial. Although we agree that prosecutors must be careful to avoid any implication that an offer of immunity is contingent upon the witness testifying other than truthfully, the record in the case before us is devoid of evidence suggesting that immunity was offered with a purpose to corrupt the witness or to improperly influence him.
Lunsford was subject to rigorous cross-examination on the issue of any "deal" that might have been struck between him and the prosecution. Taylor's counsel made liberal use of Evid.R. 616(A), which permits a witness to be impeached by exposing potential biases or motives he might have to misrepresent the truth. The jury was made award of the grant of immunity and was free to consider that fact in determining what weight to give Lunsford's testimony.
Finally, we note that the practice of granting leniency to witnesses in exchange for truthful testimony has long been recognized in Ohio. See State v. Hector (1969), 19 Ohio St.2d 167,178-179; State v. Worley (1976), 46 Ohio St.2d 316. Also, the federal courts have recognized a "longstanding practice sanctioning the testimony of accomplices against their confederates in exchange for leniency." See, U.S. v. Singleton,165 F.3d 1297, 1301; U.S. v. Ware, 161 F.3d 414, 421 (6th Cir., 1998).
The Fourth Assignment of Error is overruled.
 VI
All of Taylor's Assignments of Error having been overruled, the judgment of the trial court is Affirmed.
BROGAN and WOLFF, JJ., concur.