United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 9, 1998 Decided February 9, 1999 

 Nos. 97-3100 and 97-3184

 United States of America, 

 Appellee

 v.

 Charles W. Ramsey, 

 Appellant

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 95cr00326-01)

---------

 Francis D. Carter, appointed by the court, argued the 
cause for the appellant.

 Charles W. Ramsey filed a brief pro se.

 Michael Fitzpatrick, Assistant United States Attorney, ar-
gued the cause for the appellee. Wilma A. Lewis, United 
States Attorney, and John R. Fisher, Mary-Patrice Brown 
and John P. Dominguez, Assistant United States Attorneys, 
were on brief for the appellee.


 Before: Wald, Williams and Henderson, Circuit Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: Charles Ram-
sey was convicted of one count of possessing cocaine with 
intent to distribute in violation of 21 U.S.C. s 841(a)(1), 
(b)(1)(B)(ii). Through counsel, Ramsey raises several issues, 
including whether the trial court erred: (1) in allowing the 
Government to introduce evidence of Ramsey's character; (2) 
in failing to find entrapment as a matter of law and (3) in 
sentencing Ramsey to 210 months' imprisonment. Ramsey 
pro se appeals the Government's use of Francisco Fierro as 
an informant witness. Finding no error, we affirm Ramsey's 
conviction and sentence.

 I. Background

 On December 14, 1995, Ramsey was charged in a two-count 
indictment with one count of possessing cocaine with intent to 
distribute, see 21 U.S.C. s 841(a)(1), (b)(1)(B)(ii), and one 
count of attempted possession with intent to distribute, see 21 
U.S.C. s 846. The charges arose out of a Drug Enforcement 
Administration (DEA) undercover operation that began earli-
er in 1995 when Francisco Fierro agreed to assist DEA as an 
informant, following his arrest for attempted murder and 
various weapons offenses after a fight in a Miami restaurant. 
Although Fierro could provide no leads in Florida, DEA 
decided to use Fierro as an informant in the Washington, 
D.C. area because his main client had been a Washington-
area drug dealer named Charles Ramsey. Fierro informed 
DEA Agent Ronald Woods that he had delivered substantial 
quantities of drugs to Ramsey in Washington at least eight 
times in 1993-94 and that Ramsey accounted for all of his 
kilogram-level sales.

 The first transaction between Fierro and Ramsey took 
place in Georgetown in early 1993 when Fierro delivered 
approximately seven ounces of heroin to Ramsey. Seven 
times over the following year, Fierro delivered between one 
and ten kilograms of cocaine to Ramsey, selling him in toto 39 


kilograms of cocaine for approximately $20,000 each.1 The 
two men used a delivery procedure that involved a meeting, 
usually in a hotel room, where Fierro "fronted" Ramsey one 
or two kilograms. Ramsey then left to sell the cocaine and 
returned later with payment. Fierro then fronted Ramsey 
another one or two kilograms and Ramsey repeated the 
procedure until all of the drugs had been sold, usually within 
one week. In mid-1994, at his wife's insistence, Fierro left 
the drug trade.

 In September 1995 DEA decided to use Fierro in a "re-
verse" undercover operation against Ramsey. DEA's initial 
plan was to conduct the transaction differently from the way 
Fierro and Ramsey had traditionally done business--by mak-
ing Ramsey pay for the drugs up front. DEA also sought to 
increase its control over the operation by having DEA Agent 
Robert Valentine pose as a drug dealer. Fierro's role was to 
facilitate the exchange between Valentine and Ramsey.

 Between mid-September 1995 and his arrest on November 
21, 1995, Ramsey and Fierro had numerous recorded tele-
phone and face-to-face conversations about drug transactions. 
Most of the conversations were recorded by DEA or by 
Fierro using DEA-supplied equipment. On September 25, 
1995 Ramsey met Fierro in a hotel room. During a video-
taped conversation, they discussed a five-kilogram transaction 
and the fact that Valentine, posing as the distributor, re-
quired payment up front. While Ramsey was eager to move 
several kilograms, he did not have the cash to buy the drugs 
at delivery. On October 6, 1995 Valentine and Ramsey met 
without Fierro at a restaurant. Ramsey mentioned that 
Washington was currently "dry" of cocaine on both the whole-
sale and retail levels, a fact consistent with DEA information. 
Ramsey wanted to know if the drugs could be fronted but 
Valentine refused. Nevertheless, Valentine assured Ramsey 

__________
 1 The district court ruled that Ramsey's seven cocaine transac-
tions with Fierro were admissible to show intent and absence of 
mistake under Fed. R. Evid. 404(b) but it ruled any reference to the 
heroin from their first transaction inadmissible under Fed. R. Evid. 
403.


that he would contact him about selling five kilograms of 
cocaine.

 On October 24, 1995 Valentine and Fierro met Ramsey at a 
hotel. They had cocaine with them. In an audio taped 
conversation Ramsey asked to see the cocaine but, after going 
"around and around" with Valentine, still refused to pay up 
front. Tr. at 506. The three men arranged to meet again on 
November 2, 1995. On November 2, in a videotaped conver-
sation in Valentine's car, Valentine showed Ramsey five one-
kilogram bricks. Ramsey said that he could move the cocaine 
quickly and offered to pay for one kilogram but not until 8:00 
p.m. that evening. Becoming increasingly suspicious, Valen-
tine rejected the offer.

 After this transaction fell through, it was clear to DEA that 
Ramsey would not deal unless he was fronted the drugs and 
that Ramsey preferred to deal only with Fierro. Therefore, 
DEA changed its strategy by pulling Valentine out of the 
operation and instructing Fierro to arrange a buy using his 
old procedure. On November 15, 1995 Fierro contacted 
Ramsey and offered to front him five kilograms on November 
21, 1995. When Ramsey arrived at Fierro's hotel room on 
the 21st, Fierro showed him the five one-kilogram bricks. 
Agreeing to a cost of $20,000 each, Ramsey decided to take 
two kilograms and said that he would return for the other 
three. Ramsey then placed the two bricks inside a black 
duffle bag and left the room. He was arrested by DEA 
agents in the hallway and the drugs were recovered from his 
bag.2

 On May 14, 1996 Ramsey's jury trial commenced in the 
district court. On May 21, 1996 the jury returned a guilty 
verdict on the first count. Before sentencing, Ramsey filed a 

__________
 2 Ramsey gave DEA a written statement before signing a 
written waiver of his Fifth and Sixth Amendment rights. After the 
statement had been admitted into evidence at trial, the district 
court suppressed the statement. Ramsey's defense counsel affir-
matively asked that a mistrial not be granted. The district court 
instructed the jury to disregard the statement and related testimo-
ny.


pro se motion for a new trial, arguing ineffective assistance of 
counsel. The district court appointed new counsel on Sep-
tember 16, 1996 and issued an order on June 27, 1997 denying 
Ramsey's new trial motion as not timely filed. After a 
hearing, the district court denied Ramsey's objections to the 
presentence report in a December 15, 1997 order. On De-
cember 17, 1997 the district court sentenced Ramsey to 210 
months' imprisonment followed by eight years of supervised 
release. Ramsey timely filed this appeal, requesting that his 
conviction be reversed or, alternatively, that he be resen-
tenced.

 II. Discussion

 A.

 On appeal, Ramsey advances several arguments, all without 
merit. First, Ramsey argues that the district court erred by 
twice admitting Valentine's testimony about Ramsey's past 
criminal history. The district court, however, did not abuse 
its discretion3 in admitting the evidence because Valentine's 
testimony was not elicited to show Ramsey's propensity to 
commit a crime, see Fed. R. Evid. 404(a), but rather as a 
response to defense counsel's attempts to challenge the volun-
tariness of Ramsey's statement and to defense counsel's 
theory that DEA had entrapped Ramsey based on the "lies" 
of its informant, Fierro. As the record manifests, Ramsey's 
counsel raised the subject of his client's extensive criminal 
history. See United States v. Davis, 127 F.3d 68, 71 (D.C. 
Cir. 1997) ("The elicitation by the defense of the very testimo-
ny now challenged ... for its own affirmative purposes, is an 
independent reason for finding no error...."), cert. denied, 
119 S. Ct. 215 (1998); United States v. Baumgarten, 517 F.2d 
1020, 1029 (8th Cir. 1975) (finding no prejudice from redirect 
__________
 3 If defense counsel properly preserved his objection at trial, 
we review the district court's admission of evidence for abuse of 
discretion. See United States v. Salamanca, 990 F.2d 629, 637 
(D.C. Cir.), cert. denied, 510 U.S. 928 (1993). Nevertheless, the 
district court's decision to admit evidence, even of prior bad acts, is 
entitled to "much deference" on review. United States v. Lewis, 
693 F.2d 189, 193 (D.C. Cir. 1982).

regarding defendant's prior arrests after defense counsel, on 
cross-examination of government witness, raised issue), cert. 
denied, 423 U.S. 878 (1975). Moreover, Ramsey was not 
prejudiced by the testimony since the Government had al-
ready introduced evidence of two previous narcotics convic-
tions to rebut Ramsey's entrapment defense.

 Second, Ramsey contends that Valentine provided opinion 
testimony about the drug trade even though he was not 
qualified as an expert witness under Federal Rule of Evi-
dence 702.4 We believe that the district court did not plainly 
err in admitting this testimony. Although the trial judge 
never formally qualified Valentine as an expert witness, his 
testimony functionally satisfied the requirements for expert 
testimony set forth in Federal Rule of Evidence 702.5 See 
United States v. Walls, 70 F.3d 1323, 1326 (D.C. Cir. 1995) 
(finding opinion testimony admissible under Rule 702 as 
" 'specialized knowledge' [that] would 'assist the trier of fact 
to understand the evidence' ") (quoting Fed. R. Evid. 702), 
cert. denied, 117 S. Ct. 90 (1996); United States v. McDonald, 
933 F.2d 1519, 1522 n.2 (10th Cir.) (where "the court heard 
the witness describe his qualifications, including his special-
ized knowledge, education, skill and experience, and then 
allowed the witness to give opinion testimony," appellate 
court can assume witness was accepted as expert witness), 
cert. denied, 502 U.S. 897 (1991); United States v. Maher, 645 
F.2d 780, 783-84 (9th Cir. 1981) (DEA agent not qualified as 
expert but his expert testimony on drug trade was upheld in 
light of his experience).

 We also find no plain error in the district court's failure to 
instruct the jury regarding the proper weight to be given 
Valentine's opinion testimony since Ramsey can show no 
prejudice from the admission of that testimony. See United 
States v. Olano, 507 U.S. 725, 734 (1993) (in plain error cases 

__________
 4 Because Ramsey made no objection at trial, our review is for 
plain error. See Lewis, 693 F.2d at 193.

 5 Rule 702 states in part: "[A] witness qualified as an expert by 
knowledge, skill, experience, training, or education, may testify 
thereto in the form of an opinion or otherwise."

appellant bears "burden of persuasion with respect to preju-
dice"); United States v. Catlett, 97 F.3d 565, 571 (D.C. Cir. 
1996) (no bar in this Circuit to "dual testimony as both a fact 
and expert witness"); see also United States v. Anderskow, 
88 F.3d 245, 251 (3d Cir.) (no prejudice in light of overwhelm-
ing evidence of defendant's predisposition and guilt and fact 
that Government did not rely on challenged opinion testimony 
during summation), cert. denied, 117 S. Ct. 613 (1996). In 
fact, Ramsey's own counsel repeatedly asked Valentine for 
opinion testimony during cross-examination.

 Nor do we accept Ramsey's contention that Valentine's 
purported opinion testimony violated Federal Rule of Evi-
dence 704 given the context of the prosecutor's question and 
Valentine's answer. See United States v. Smart, 98 F.3d 
1379, 1388 (D.C. Cir. 1996) (adopting Seventh Circuit test to 
determine whether expert testimony violates Rule 704(b), 
which "assess[es] two key elements," to wit: "(1) the lan-
guage used by the questioner and/or the expert, including use 
of the actual word 'intent'; and (2) whether the context of the 
testimony makes clear to the jury that the opinion is based on 
knowledge of general criminal practices, rather than some 
special knowledge of the defendant's mental processes") (quo-
tation omitted), cert. denied, 117 S. Ct. 1271 (1997). After an 
initial defense objection, the district court allowed the prose-
cutor to ask Valentine, "[D]id you have information indepen-
dent of what you learned from [Fierro] and Mr. Ramsey 
himself which led you to believe that Mr. Ramsey would be 
ready and willing and able to engage in this cocaine transac-
tion?" Tr. at 552. Ramsey argues that by answering "Yes" 
to the prosecutor's question, Valentine, if considered an ex-
pert witness, violated Rule 704(b) ("[n]o expert witness testi-
fying with respect to the mental state or condition of a 
defendant in a criminal case may state an opinion or inference 
as to whether the defendant did or did not have the mental 
state or condition constituting an element of the crime 
charged or of a defense thereto"). Since predisposition to 
commit a crime implicates Ramsey's entrapment defense, he 
argues that Valentine's affirmation that he was "ready and 
willing and able to engage in this cocaine transaction," with-


out a limiting jury instruction is plain error, citing United 
States v. Boyd, 55 F.3d 667, 671 (D.C. Cir. 1995), and United 
States v. Williams, 980 F.2d 1463, 1466 (D.C. Cir. 1992). 
Valentine, however, testified merely as to his agency's knowl-
edge and intent at the time it decided to initiate an undercov-
er operation against Ramsey to rebut defense counsel's sug-
gestion that DEA relied solely on Fierro for information 
about Ramsey's willingness to deal drugs. See, e.g., Tr. at 
550 (prosecutor affirming, "All I want to ask [Valentine] is if 
he has pertinent information that led him to believe that 
there was not going to be an entrapment issue....").

 We next reject Ramsey's claim of entrapment as a matter 
of law because the record contains ample evidence that 
Ramsey was predisposed to commit a drug offense. See 
United States v. Neville, 82 F.3d 1101, 1107 (D.C. Cir. 1996); 
United States v. Budd, 23 F.3d 442, 445 (D.C. Cir. 1994), cert. 
denied, 513 U.S. 1115 (1995).6 The record reflects that 

__________
 6 To establish entrapment Ramsey must first show that he was 
induced by the Government to commit a crime he otherwise would 
not have committed. If Ramsey meets his burden, the Government 
must then prove beyond a reasonable doubt that he was predis-
posed to commit the crime. See Neville, 82 F.3d at 1107; Budd, 23 
F.3d at 445. Under our "bifurcated approach," "the jury, not the 
judge, decides whether the defendant has carried his burden of 
proving inducement" and, if so, whether "the government has met 
its burden of proving predisposition." United States v. Whoie, 925 
F.2d 1481, 1483 (D.C. Cir. 1991). Our review "focus[es] on the 
predisposition issue" and "must uphold the jury's verdict if, viewing 
the evidence in the light most favorable to the Government, a 
reasonable jury could have found that the Government proved 
beyond a reasonable doubt that the defendant was predisposed to 
commit the crime." Neville, 82 F.3d at 1107 (citing Budd, 23 F.3d 
at 445 & n.2). To establish predisposition, the Government must 
show a "state of mind which readily responds to the opportunity 
furnished by the officer or his agent to commit the forbidden act," 
United States v. Burkley, 591 F.2d 903, 916 (D.C. Cir. 1978) 
(quotation omitted), cert. denied, 440 U.S. 966 (1979), based on "the 
entirety of the events surrounding the ultimate commission of the 
crime," United States v. Kelly, 748 F.2d 691, 699 (D.C. Cir. 1984). 
Relevant considerations include: Ramsey's level of interest in the 

Ramsey had a long history of dealing in substantial quantities 
of drugs. This evidence includes: 1975 and 1976 convictions 
of similar offenses, see Neville, 82 F.3d at 1107-08 (finding 
evidence of prior criminal activity probative of appellant's 
predisposition); testimony by Fierro, Valentine and Agent 
Woods that Ramsey had frequently and recently bought large 
quantities of cocaine from Fierro using "fronting" to pay for 
the drugs; and Ramsey's recorded admissions of previous 
narcotics deals and interest in having Fierro supply him with 
cocaine. Although Ramsey points to his several unproductive 
meetings with Fierro and Valentine to suggest that he was 
reluctant to buy, his reluctance evaporated as soon as Fierro 
agreed to front him the drugs.

 Nor did the district court err in counting the 39 kilograms 
of cocaine Ramsey purchased from Fierro in 1993-94 as part 
of the "same course of conduct" as Ramsey's offense of 
conviction under the Sentencing Guidelines. U.S.S.G. 
s 1B1.3(a)(2) (requiring district court to determine offense 
level "solely with respect to offenses ... that were part of the 
same course of conduct or common scheme or plan as the 
offense of conviction"); see United States v. Ramsey, No. 
95-326, at 3-6 (D.D.C. Dec. 15, 1997) (sentencing opinion); 
see also United States v. Pinnick, 47 F.3d 434, 438 (D.C. Cir. 
1995) (clear error review of district court's determination that 
past conduct is related to offense of conviction). "Extraneous 
offenses qualify as part of the same course of conduct if 'they 
are sufficiently connected or related to each other as to 
warrant the conclusion that they are part of a single episode, 
spree, or ongoing series of offenses.' " Pinnick, 47 F.3d at 
438 (quoting U.S.S.G. s 1B1.3(a)(2), comment n.9(B)). Thus, 
the district court's inquiry must "focus[ ] on whether the 
defendant repeats the same type of criminal activity over time 
and engage[s] in an identifiable behavior pattern of specified 
criminal activity." Id. (quotation omitted). Here, the district 

__________
transaction, the pressure applied by the Government, any reluc-
tance displayed by Ramsey and Ramsey's past illegal conduct. See 
Neville, 82 F.3d at 1107-08; Budd, 23 F.3d at 446; Burkley, 591 
F.2d at 916.


court went beyond an analysis of temporal proximity, noting 
that the transactions involved the same parties, see United 
States v. Jones, 948 F.2d 732, 737 (D.C. Cir. 1991), were of a 
similar character and nature and involved between one and 
ten one-kilogram bricks of cocaine, see Pinnick, 47 F.3d at 
439, and that the temporary hiatus was Fierro's, rather than 
Ramsey's, decision. See United States v. Santiago, 906 F.2d 
867, 872 (2d Cir. 1990) (transactions separated by 8-14 
months while buyer was incarcerated were sufficiently similar 
in other respects to constitute same course of conduct). 
Since Ramsey's nine drug transactions with Fierro manifest-
ed an ongoing relationship and pattern of criminal activity, 
the district court did not clearly err in counting 39 kilograms 
from previous transactions as part of the "same course of 
conduct" under U.S.S.G. s 1B1.3(a)(2).

 Finally, Ramsey cannot establish sentencing entrapment 
because the district court correctly found that he was predis-
posed to purchase five kilograms on November 21, 1995. See 
United States v. Shepherd, 102 F.3d 558, 566 (D.C. Cir. 1997) 
(for sentencing entrapment "main element ... is ... the 
defendant's predisposition") (quotation omitted); Walls, 70 
F.3d at 1329 (same); see also United States v. Washington, 
106 F.3d 983, 1015 (D.C. Cir. 1997) (reviewing district court's 
findings of fact for clear error, "giving due deference to the 
district court's application of the Guidelines to the facts"), 
cert. denied, 118 S.Ct. 446 (1997). For instance, the record 
shows inter alia that Ramsey saw the five kilograms, asked 
Fierro to supply drugs weekly and routinely purchased up to 
ten, but ordinarily five, kilograms using the fronting method. 
See Shepherd, 120 F.3d at 566.7

__________
 7 In any event our decision affirming the district court's finding 
that Ramsey's relevant conduct included the 39 kilograms that he 
purchased in 1993-94 makes his sentencing entrapment argument 
moot. The district court attributed 44 kilograms of cocaine to 
Ramsey, of which five kilograms were from his November 21, 1995 
offense of conviction, in calculating a base offense level of 34. 
Nevertheless, Ramsey asserts that he was only predisposed to 
purchase one of the five kilograms of cocaine from Fierro on 
November 21, 1995. See Appellant's Br. at 31-32; Appellee's Br. at 

 B.

 Ramsey's pro se challenge8 requires a lengthier discussion 
not because of its merit but because our Circuit has not 
heretofore ruled on the challenge that our sister circuit courts 
have rejected. Ramsey asks this Court to consider whether 
the Government's use of Fierro as an informant violated 18 
U.S.C. s 201(c)(2).9 Ramsey made his challenge after the 
Tenth Circuit, in an unprecedented10 decision, held that a 
federal prosecutor's agreement granting leniency to an ac-
complice in return for truthful testimony as a government 
witness violated the plain language of section 201(c)(2). See 
United States v. Singleton, 144 F.3d 1343, 1352 (10th Cir. 
1998). The court therefore held inadmissible the accomplice's 
testimony and reversed Singleton's conviction. See id. at 
1347. The Tenth Circuit sitting en banc has since reversed 
the panel decision. See United States v. Singleton, 1999 WL 
6469 (10th Cir. Jan. 8, 1999) (en banc). In the meantime, the 
Singleton panel's interpretation of section 201(c)(2) has been 
rejected by the Fifth and Sixth Circuits and every federal 
district court to consider the issue, save three. See, e.g., 

__________
31 & n.22. But see Sentencing Tr. at 13 (Ramsey's counsel in-
formed court that relevant amount of drugs was "two kilograms of 
cocaine [Ramsey] walked out the door with"). According to 
U.S.S.G. s 2D1.1(c)(3), however, "[a]t least 15 KG but less than 50 
KG of [c]ocaine" places Ramsey at level 34. Thus, reducing the 
amount of cocaine attributable to Ramsey by four (or even five) 
kilograms is of no significance.

 8 Because Ramsey makes this argument for the first time on 
appeal, we apply the plain error standard of review. See Fed. R. 
Crim. P. 52(b); United States v. Olano, 507 U.S. 725 (1993).

 9 Section 201(c)(2) subjects to criminal liability: "Whoever ... 
directly or indirectly, gives, offers or promises anything of value to 
any person, for or because of the testimony under oath or affirma-
tion given or to be given by such person as a witness" in a federal 
trial or proceeding.

 10 Until Singleton, no other court in the thirty-six year history 
of section 201(c)(2) had applied its prohibition to a prosecutorial 
grant of leniency in exchange for truthful testimony.

United States v. Haese, 162 F.3d 359, 366 (5th Cir. 1998) 
(rejecting Singleton and noting that circuit precedent has 
"consistently ... upheld government efforts to provide bene-
fits to witnesses in exchange for testimony") (quotation omit-
ted); United States v. Webster, 162 F.3d 308, 357-58 (5th Cir. 
1998) (rejecting Singleton on plain error review); United 
States v. Ware, 161 F.3d 414 (6th Cir. 1998); United States v. 
Szur, 1998 WL 661484 (S.D.N.Y. Sept. 24, 1998); United 
States v. Mejia, 1998 WL 598098 (S.D.N.Y. Sept. 8, 1998); 
United States v. Barbaro, 1998 WL 556152 (S.D.N.Y. Sept. 1, 
1998) (rejecting Singleton because of historical acceptance of 
leniency in exchange for truthful testimony); United States v. 
Juncal, 1998 WL 525800 (S.D.N.Y. Aug. 20, 1998) (relying on 
historical acceptance of leniency in exchange for testimony 
and on canon of statutory construction requiring that govern-
ment be expressly included in statutory text to come within 
statute's purview); United States v. Reid, 19 F. Supp. 2d 534 
(E.D. Va. 1998); United States v. Arana, 18 F. Supp. 2d 715 
(E.D. Mich. 1998); United States v. Dunlap, 17 F. Supp. 2d 
1183 (D. Colo. 1998); United States v. Pungitore, 15 F. Supp. 
2d 705 (E.D. Pa. 1998); United States v. Guillaume, 13 
F. Supp. 2d 1331 (S.D. Fla. 1998); United States v. Eisen-
hardt, 10 F. Supp. 2d 521 (D. Md. 1998) (criticizing Single-
ton's reasoning, particularly application of exclusionary rule); 
United States v. Gabourel, 9 F. Supp. 2d 1246 (D. Colo. 1998). 
But see United States v. Mays, No. 97-CR-127 (E.D. Tenn. 
Sept. 18, 1998); United States v. Lowery, 15 F. Supp. 2d 1348 
(S.D. Fla. 1998) (agreeing with Singleton that plain meaning 
of section 201(c)(2) encompasses government); United States 
v. Fraguela, 1998 WL 560352 (E.D. La. Aug. 27, 1998) 
(adopting Lowery).

 For several reasons, we hold that section 201(c)(2) does not 
prohibit the Government from granting leniency in exchange 
for truthful testimony.

 We first look to the Dictionary Act, 1 U.S.C. s 1, which is 
to be used "[i]n determining the meaning of any Act of 
Congress, unless the context indicates otherwise," and note 
that its definition of "whoever" does not expressly include the 
United States. 1 U.S.C. s 1 (defining "whoever" to include 


"corporations, companies, associations, firms, partnerships, 
societies, and joint stock companies, as well as individuals"). 
Moreover, we conclude that the meaning of "[w]hoever" in 
section 201(c)(2) should be limited by the canon of construc-
tion that a statute does not apply to the government or affect 
governmental rights unless the text expressly includes the 
government. In United States v. Nardone, 302 U.S. 379, 383 
(1937), the Supreme Court declared, "[T]he cases in which 
[the canon] has been applied fall into two classes." First, the 
canon applies if application of the statute to the United States 
"would deprive the sovereign of a recognized or established 
prerogative title or interest." Id. There are, according to 
Nardone, two exceptions to this class of cases. Under the 
first exception, "[t]he rule of exclusion of the sovereign is less 
stringently applied where the operation of the law is upon the 
agents or servants of the government rather than on the 
sovereign itself." Id.11

 The Nardone canon also applies if application of the statute 
to public agents would create an obvious absurdity. See id. 
at 384; see also United States v. Granderson, 511 U.S. 39, 47 
n.5 (1994) (statute's plain meaning disregarded if it "leads to 
an absurd result").12

 We first conclude that application of section 201(c)(2) to the 
United States would deprive the sovereign of a critically 
important interest, one that is well established in our legal 
system and recognized by the courts, the Congress and, more 
recently, the United States Sentencing Commission. The 

__________
 11 The second exception to this class of cases provides that "the 
sovereign is embraced by general words of a statute intended to 
prevent injury and wrong" even if the statute infringes upon a 
recognized government prerogative. Nardone, 302 U.S. at 384.

 12 As at least two courts have noted, Nardone did not expressly 
so limit the canon's applicability. See Ware, 161 F.3d at 419 n.1; 
Arana, 18 F. Supp. 2d at 718 ("Nothing in [Nardone] or any other 
Supreme Court decision 'limits' application of the canon to only the 
two classes of cases mentioned."). Nardone simply noted that the 
canon "has been applied" to the two types of cases discussed 
therein. Nardone, 302 U.S. at 383.

prosecutorial prerogative to recommend leniency in exchange 
for truthful testimony arises from English common law, see 
Ware, 161 F.3d at 419, and has been repeatedly approved by 
the United States Supreme Court, which noted its "ancient" 
origins and "established usage" in holding:

 that an accomplice duly admitted as a witness in a 
 criminal prosecution against his associates ... , if he 
 testifies fully and fairly, will not be prosecuted for the 
 same offence.... When he fulfills those conditions he is 
 equitably entitled to a pardon, and the prosecutor, and 
 the court if need be, when fully informed of the facts, will 
 join in such a recommendation.

The Whiskey Cases (United States v. Ford), 99 U.S. 594, 599-
601, 604 (1878). Although the Supreme Court has not yet 
addressed the issue before us, it has consistently upheld the 
practice of plea bargaining. Other Supreme Court cases 
sanction by implication a prosecutorial promise of leniency in 
exchange for truthful testimony. See Delaware v. Van Ars-
dall, 475 U.S. 673, 679-80 (1986) (concluding that court's 
refusal to allow defendant to question witness about dis-
missed charge violated Sixth Amendment right to confronta-
tion); Roberts v. United States, 445 U.S. 552, 558 (1980) 
(affirming sentence due in part to defendant's refusal to 
cooperate with government in spite of being offered "favor-
able disposition of his case"); id. at 568 (Marshall, J., dissent-
ing) (expressly upholding plea bargaining process); Giglio v. 
United States, 405 U.S. 150 (1972) (holding prosecution's 
failure to disclose promise of leniency to witness, provided in 
exchange for that witness's testimony, violated due process).

 Circuit courts have been more explicit in their approval of a 
prosecutorial plea agreement with an accomplice or co-
defendant conditioned on his truthful testimony for the Gov-
ernment. See, e.g., United States v. Gomez, 810 F.2d 947, 956 
(10th Cir. ), cert. denied, 482 U.S. 908 (1987); United States v. 
Dailey, 759 F.2d 192, 196 (1st Cir. 1985) (noting that "[l]ong 
ago the courts rejected the notion that the testimony of co-
defendants and other interested witnesses was so likely to be 
unreliable that it should be excluded"); United States v. 


Kimble, 719 F.2d 1253 (5th Cir. 1983), cert. denied, 464 U.S. 
1073 (1984); United States v. McCallie, 554 F.2d 770, 772 (6th 
Cir. 1977); United States v. Barrett, 505 F.2d 1091, 1102 (7th 
Cir. 1974) (sanctioning grant of civil immunity in exchange for 
testimony and stating, "If the government can excuse crimi-
nal or civil liability in settling a criminal case, surely it can 
use that power of compromise to obtain guilty pleas or to 
procure testimony in other proceedings. Both are legitimate 
objectives of plea bargaining.") (emphasis original), cert. de-
nied, 421 U.S. 964 (1975). According to the Fifth Circuit, 
"No practice is more ingrained in our criminal justice system 
than the practice of the government calling a witness who is 
an accessory to the crime for which the defendant is charged 
and having that witness testify under a plea bargain that 
promises him a reduced sentence." United States v. 
Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987), cert. 
denied sub nom. Nelson v. United States, 484 U.S. 1026 
(1988).

 Moreover, the Federal Rules of Criminal Procedure recog-
nize and accept plea bargaining. Although Rule 11(e), which 
sets out the procedure governing plea agreements, does not 
identify the types of commitments the Government may ask 
of individuals in exchange for leniency, the Advisory Commit-
tee notes recognize that an agreement may require more than 
relinquishing the right to trial. According to the notes to the 
1975 amendments of Rule 11:

 [It is apparent, though not explicitly stated, that Rule 
 11(e) contemplates that the plea agreement may bind the 
 defendant to do more than just plead guilty or nolo 
 contendere. For example, the plea agreement may bind 
 the defendant to cooperate with the prosecution in a 
 different investigation. The Committee intends by its 
 approval of Rule 11(e) to permit the parties to agree on 
 such terms in a plea agreement.]

Fed. R. Crim. P. 11 Advisory Committee's notes (1975) 
(brackets in original); see also id. Advisory Committee's 
notes (1974) ("plea agreement[s] may also contribute to the 
successful prosecution of other more serious offenders").


 In addition, both the United States Code and the Sentenc-
ing Guidelines contemplate the prosecutor's use of a plea 
agreement in exchange for truthful testimony against a defen-
dant. For example, the Sentencing Reform Act of 1984 
established the United States Sentencing Commission and 
explicitly required it "to take into account a defendant's 
substantial assistance in the investigation or prosecution of 
another person who has committed an offense." 28 U.S.C. 
s 994(n). The 1984 Act also allows a court on the Govern-
ment's motion "to impose a sentence below a level established 
by statute as minimum sentence so as to reflect a defendant's 
substantial assistance in the investigation or prosecution of 
another person who has committed an offense." 18 U.S.C. 
s 3553(e). The Sentencing Guidelines themselves authorize 
the sentencing court to depart downward for any defendant 
who provides "substantial assistance in the investigation or 
prosecution of another person who has committed an offense." 
U.S.S.G. s 5K1.1. Among the factors the court may consider 
in determining whether to grant the Government's motion for 
downward departure are "the truthfulness, completeness, and 
reliability of any information or testimony provided by the 
defendant." U.S.S.G. s 5K1.1(a)(2).

 Moreover, application of section 201(c)(2) to the Govern-
ment obstructs the sovereign's, not the individual prosecu-
tor's, interest in plea agreements inasmuch as the prosecutor 
brings federal criminal charges in the name of the United 
States. As the Sixth Circuit aptly noted:

 When an assistant United States Attorney (AUSA) en-
 ters into a plea agreement with a defendant, that plea 
 agreement is between the United States government and 
 the defendant. When an AUSA uses at trial testimony 
 obtained through a plea agreement or an agreement not 
 to prosecute, he does so as the government. An AUSA 
 who, pursuant to the provisions of the United States 
 Sentencing Guidelines, moves for a downward departure 
 under s 5K1.1, does so as the government.

Ware, 161 F.3d at 421; see also 18 U.S.C. s 3553(e) (allowing 
sentence reduction "[u]pon motion of the government").

 Nor are we persuaded by any assertion that the Congress 
intended section 201(c)(2) "to prevent fraud, injury, or wrong" 
arising from government offers of leniency in exchange for 
truthful testimony. A prosecutor is obligated to disclose any 
benefit conferred on any witness, see Giglio, 405 U.S. at 150, 
and a benefit conferred under a plea agreement must be 
approved by the district court. See Fed. R. Crim. P. 11(e). 
Furthermore, any prosecutor who attempts to "corruptly" 
bribe a witness could be prosecuted under 18 U.S.C. 
s 201(b)(3).13 Accordingly, having determined that neither of 
the exceptions to the first class of Nardone cases applies, we 
conclude that application of section 201(c)(2) to the Govern-
ment would deprive the sovereign of a recognized and estab-
lished prerogative and interest. See Nardone, 302 U.S. at 
383.
 In addition, we believe this case falls within the second 
class of cases to which the Nardone canon applies. Applica-
tion of section 201(c)(2) to a federal prosecutor offering 
leniency in exchange for truthful testimony works obvious 
absurdities. To interpret section 201(c)(2) as the Tenth Cir-
cuit originally did, see Singleton 144 F.3d at 1346-48, would 
expose to criminal liability any federal prosecutor who en-
tered into a plea agreement pursuant to Rule 11(e) and any 
federal judge who either approved a Rule 11(e) plea agree-
ment or reduced a sentence pursuant to 18 U.S.C. s 3553(e) 
or U.S.S.G. s 5K1.1(a)(2) based in part on a witness's testimo-
__________
 13 Section 201(b)(3) subjects to criminal liability:

 Whoever ... directly or indirectly, corruptly gives, offers, or 
 promises anything of value to any person, or offers or promises 
 such person to give anything of value to any other person or 
 entity, with intent to influence the testimony under oath or 
 affirmation of such first-mentioned person as a witness [in 
 federal trials or proceedings] or with intent to influence such 
 person to absent himself therefrom.... 

18 U.S.C. s 201(b)(3) (emphasis added). That section 201(b)(3) applies to federal prosecutors 
while section 201(c)(2) does not, despite the similarities between the two sections, follows from
Nardone; the Government has no recognized interest in paying a witness to give untruthful
testimony and no absurdity would result in punishing a prosecutor who offers a witness money or
any other thing of value to obtain untruthful testimony.


ny.14 See Arana, 18 F. Supp. 2d at 719; Dunlap, 17 F. Supp. 
2d at 1184-87. In addition, such an interpretation of section 
201(c)(2) would end a centuries-old practice of allowing coop-
erating criminals to testify against their confederates in hopes 
of receiving more lenient treatment. Faced with a ban on a 
plea agreement in exchange for cooperative testimony, the 
Government would face a near impossible task in trying to 
convict those higher up in a criminal organization. See 
generally Kastigar v. United States, 406 U.S. 441, 446 (1972) 
(noting enactment of immunity statutes "reflects the impor-
tance of testimony, and the fact that many offenses are of 
such a character that the only persons capable of giving 
useful testimony are those implicated in the crime").

 The application of section 201(c)(2) to public officers also 
produces an absurd conflict with statutory schemes prescrib-
ing reduced sentences and immunity for co-conspirators and 
accomplices who provide testimony for the Government. See, 
e.g., 18 U.S.C s 3521 (Witness Relocation and Protection 
Act authorizing Attorney General to exchange things of value 
for witness's agreement "to testify"); 18 U.S.C s 3553(e) 
(reduction below statutory minimum sentence authorized in 
exchange for "substantial assistance"); 18 U.S.C ss 6001-05 
(federal immunity statutes); 28 U.S.C. s 994(n) (requiring 
Sentencing Commission to provide for sentencing guideline 
reductions); Gabourel, 9 F. Supp. 2d at 1247 (rejecting 
original Singleton interpretation after examining "the larger 
statutory context, its object and policy"). For instance, 18 
U.S.C. s 6003, a provision of the Organized Crime Control 

__________
 14 As the Sixth Circuit correctly noted:

 This result cannot be avoided by attempting to argue that the 
 language of the statute forbids only the use of the testimony 
 from a witness who has entered into the plea agreement, not 
 the plea agreement itself. Because a defendant who enters 
 into a plea agreement pursuant to Rule 11 must appear before 
 the court and enter his plea, the defendant's entry of that plea 
 is testimony.

Ware, 161 F.3d at 421 (citing Brady v. United States, 397 U.S. 742, 
748 (1970)).


Act of 1970, authorizes a United States Attorney, with the 
approval of the Attorney General or certain other federal 
officials, to seek a court order granting immunity to a witness 
whose testimony he considers necessary in the public interest. 
Yet a grant of immunity pursuant to 18 U.S.C. s 6003 is 
clearly "[some]thing of value" given "for or because of the 
testimony under oath or affirmation," 18 U.S.C. s 201(c)(2). 
See Ware, 161 F.3d at 423 (concluding that more recently 
enacted statutes than section 201(c)(2) "specifically allow what 
[Singleton's original] broad interpretation of the more gener-
ally applicable s 201(c)(2) would prohibit"). We therefore 
conclude that application of section 201(c)(2) to federal prose-
cutors offering leniency in exchange for testimony works 
obvious absurdities. For these reasons, we apply the Nar-
done canon "which provides that statutes do not apply to the 
government or affect governmental rights unless the text 
expressly includes the government," Nardone, 302 U.S. at 
383, and interpret "[w]hoever" as used in 18 U.S.C. 
s 201(c)(2) to be exclusive of the United States.

 If we were to find the language of 18 U.S.C. s 201(c)(2) 
ambiguous, which we do not, an examination of the relevant 
legislative history would be appropriate. See Saadeh v. Far-
ouki, 107 F.3d 52, 57 (D.C. Cir. 1997) ("If the language is 
plain on its face, courts do not ordinarily resort to legislative 
history."). Cf. Chevron U.S.A., Inc. v. Natural Resources 
Defense Council, Inc., 467 U.S. 837, 843 (1984) (If "the statute 
is silent or ambiguous with respect to the specific issue, the 
question for the court is whether the agency's answer is 
based on a permissible construction of the statute."). Noth-
ing in section 201(c)(2)'s legislative history indicates that the 
Congress intended to apply the statute to the Government's 
plea arrangements. Moreover, a sub silentio change of this 
magnitude to the well-established prosecutorial practice of 
granting leniency in exchange for testimony would be virtual-
ly unprecedented. Such a change ignores the rule of statuto-
ry construction that "[a] party contending that legislative 
action changed settled law has the burden of showing that the 
legislature intended such a change." Green v. Bock Laundry 
Mach. Co., 490 U.S. 504, 521 (1989). Although House Report 


No. 87-748, notes that section 201(h) (the predecessor of 
section 201(c)(2)) "forbids offers of payments to a witness of 
anything of value 'for or because of' testimony given or to be 
given," the legislative history contains no indication that 
section 201, originally enacted in 1962 by Pub. L. No. 87-849, 
was designed to terminate the longstanding prosecutorial 
prerogative of exchanging leniency for truthful testimony. 
H.R. Rep. No. 87-748, at 16 (1961); see also S. Rep. No. 
87-2213 (1961) (containing same language). The legislative 
history of the 1970, 1986 and 1994 amendments to section 201 
is also silent on the issue. Nor do those amendments address 
the resulting contradiction in the statutory scheme if the 
Congress had intended section 201(c)(2) to apply to the 
Government. In particular, the 1986 and 1994 amendments 
were passed after 18 U.S.C s 3553(e) (reduction below statu-
tory minimum sentence), 18 U.S.C s 6003 (immunity statute) 
and 28 U.S.C. s 994(n) (requiring Sentencing Commission to 
allow sentencing guideline reductions) but the potential con-
flict with these statutes was never addressed. As the Sixth 
Circuit rightly concluded, "Clearly the explanation is that no 
such conflict exists as s 201(c)(2) was never intended to apply 
to the government." Ware, 161 F.3d at 423 (citing Pub. L. 
No. 99-570 s 1007, 1986 U.S.C.C.A.N. (100 Stat. 32707) 5393; 
Pub. L. No. 99-646 s 48, 1986 U.S.C.C.A.N (100 Stat. 3592) 
6139).

 Finally, even if federal prosecutors were subject to section 
201(c)(2), that fact would not justify excluding Fierro's testi-
mony. The Congress prescribed a fine or imprisonment for a 
violation of section 201(c)(2). "Where Congress has both 
established a right and provided exclusive remedies for its 
violation, we would 'encroach upon the prerogatives' of Con-
gress were we to authorize a remedy not provided for by 
statute." Ware, 161 F.3d at 424 (quoting United States v. 
Frazin, 780 F.2d 1461, 1466 (9th Cir.), cert. denied, 479 U.S. 
844 (1986)); see United States v. Thompson, 936 F.2d 1249, 
1251-52 (11th Cir. 1991) (court may not suppress testimony 
for statutory violation unless Congress explicitly or implicitly 
provided exclusion as a remedy for a violation), cert. denied, 
502 U.S. 1075 (1992); see also United States v. Hensel, 699 


F.2d 18, 29 (1st Cir. 1983) (exclusionary rule fashioned to 
vindicate "specific, constitutionally protected rights"), cert. 
denied, 461 U.S. 958 (1983); United States v. Harrington, 681 
F.2d 612, 615 (9th Cir. 1982) ("There must be an exceptional 
reason, typically the protection of a constitutional right, to 
invoke the exclusionary rule."). Moreover, the Supreme 
Court has acknowledged the "substantial" cost of exclusion 
which "hamper[s]" the enforcement of valid laws and keeps 
"concededly relevant and reliable evidence" from the jury. 
United States v. Janis, 428 U.S. 433, 447 (1976); see also 
United States v. Payner, 447 U.S. 727, 734 (1980) ("[U]nbend-
ing application of the exclusionary sanction ... would impede 
unacceptably the truth-finding functions of judge and jury. 
After all, it is the defendant, and not the constable, who 
stands trial.").

 III. Conclusion

 For the foregoing reasons, we hold that 18 U.S.C. 
s 201(c)(2) does not prohibit the Government from granting 
leniency in exchange for a witness's truthful testimony. As 
discussed earlier, Ramsey's other assignments of error are 
without merit. Accordingly, the defendant's conviction and 
sentence are

 Affirmed.